**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **SUSAN GUY AND GERALD GUY,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 1:18-360-KD-MU** |
| | ) | |
| **WAL-MART STORES EAST, LP,** [1] | ) | |
| | ) | |
| **Defendant,** | ) | |

## ORDER

Plaintiffs Susan and Gerald Guy filed a three-count complaint alleging: (1) negligence;
(2) wantonness; and (3) loss of consortium in the Circuit Court of Mobile County, Alabama.
(Doc. 1-1, p. 2–3). They allege that on July 15, 2016, Susan was seriously injured when she
slipped and fell in a puddle of water in the Dairy Department in the Saraland, Alabama Walmart.
(Doc. 1-1, p. 2). Defendant Wal-Mart Stores East, LP, removed the action on basis of diversity
jurisdiction.

This action is now before the Court on Walmart's motion for summary judgment and
brief in support, the Guys' response, Walmart's reply, and Walmart's motion to strike, the Guys'
response, and Walmart's reply (docs. 50, 52, 55, 56, 57, 58). Upon consideration and for the
reasons set forth herein the motion for summary judgment is DENIED in part and GRANTED in
part and the motion to strike is DENIED.

---

[1] Walmart answered that its correct name is "Wal-Mart Stores East, LP" (Doc. 2, p. 2).

I. <u>Findings of Fact</u>.[2]

On July 15, 2016, Susan Guy slipped and fell in water from a leaking skylight at the Walmart store in Saraland, Alabama. Previously, on February 15, 2016, there was a thunderstorm with wind and hail in Saraland, Alabama. (Doc. 52-2, p. 33).[3] On March 17, 2016, there was another thunderstorm with wind and hail. (Id., p. 33).[4] At that time, Walmart had a "Master Services Agreement" with RL Bishop & Associates, Inc. to perform repairs and maintenance for the roof and skylights. (Doc. 50-7, p. 8-9).[5] The roof area is 201,363 square feet (plus or minus). (Doc. 50-8, Advanced Roof Management report). There are approximately 220 skylights. (Doc 52-5, p. 4, RL Bishop president, Tyler Bishop, deposition excerpt).

---

[2] The facts are taken in the light most favorable to the non-movant. <u>Tipton v. Bergrohr GMBH–Siegen</u>, 965 F.2d 994, 998–99 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." <u>Priester v. City of Riviera Beach</u>, 208 F.3d 919, 925 n.3 (11th Cir. 2000).

[3] The Guys submitted a certified copy of a report from the National Centers for Environmental Information for Mobile County, Alabama, which states that "Severe thunderstorms developed across southwest and south central Alabama during the afternoon and evening of February 15th[.]" On (Doc. 52-5, p. 29). The hail was measured as "1.00 in." (Id., p. 31).

[4] The report states that "Thunderstorms moved across southwest Alabama producing large hail and damaging winds." (Doc. 52-5, p. 33). The hail was measured as "1.00 in." (Id.).

[5] Bishop testified regarding work done from 2013 through 2014 (Doc. 52-5) No claims were reported for 2015, the year before Susan's fall. According to Bishop, three skylights leaked in July 2013, and in September 2013, Walmart replaced thirteen skylights "that were leaking or showing moisture". (Doc. 52-5, p. 17-21). Bishop testified that the three skylights reported in July 2013 were part of the thirteen replaced in September 2013. (Id., p. 21). Also, during this time, one roof leak was repaired. (Doc. 52-9, p. 2, RL Bishop Claim Facts Form). In March 2014, five roof leaks were repaired, four following a storm. (Doc. 52-9, p. 3). Bishop also testified that repairs were done in April 2014 (two holes, four open laps, and one leak) and May 2014 (two leaks, five holes, one open lap, and "open lap on a skylight curb corner".) (Doc. 52-5, p. 7). Twelve damaged skylights that were found in March 2014 were replaced in June 2014. (Doc. 52-5, p. 7-8; Doc. 52-9, p. 4). Also, twelve abandoned camera mounts were removed. (Doc. 52-9, p. 4). None of the leaking or damaged skylights were identified as the skylight that leaked the day Susan fell.

On April 13, 2016, RL Bishop repaired three "holes" over housewares, electronics, and flowers, respectively. (Doc. 52-5, p. 9); Doc. 52-9, p. 4, RL Bishop Claim Fact Form). On April 18, 2016, RL Bishop again repaired a "hole" in the roof at "housewares", an "open lap found by a skylight in flowers" and reported that "sporting goods had a leaking pipe" which a plumber should "take a look at." (Doc 52-5, p. 9; Doc. 52-9, p. 5). Walmart had reported a skylight leak, but the RL Bishop technician determined the skylight was not leaking. (Id.)[6]

In June 2016, RL Bishop employees covered a leaking skylight above the toy department and repaired an "open lap" over the tire and lube department. (Doc. 50-6, p. 3-4; Doc. 52-9, p. 5). RL Bishop's employees also found five other damaged skylights in general merchandise. (Doc. 50-6, p. 4, 6; (Doc. 52-9, p. 5). They were replaced in late July 2016. (Doc. 50-6, p. 6).

On July 15, 2016 before 3:00 p.m., Susan Guy entered the Walmart to shop for groceries. (Doc. 50-2, p. 4). Susan testified that the weather was "storming" that day. (Id.). The rain continued after she went into the store. (Doc. 50-2, p. 7-8) Susan "had gotten close to the back of the store" and "went around the corner, back towards where the - - the milk and eggs" were. (Id., p. 8). "As soon as [she] came around the corner, [she] found [her]self in the floor." (Id.) When asked what caused her to slip, Susan testified: "What I understand caused me to slip is that I did not see water, the water that was in the floor." (Id., p. 11). Susan knew it was water because she "fell in it" and her clothes were "soaking wet." (Id., p. 11-12.) She described the water as "just a little, round puddle", that was "maybe as big as a small tub." (Id., p. 12). She didn't know whether "it was whole bunch of puddles or just a little one" because she was on the floor the first

---

[6] Also, in April 2016, RL Bishop cleaned and painted gutters and replaced a downspout. (Doc. 52-9, p. 5).

time she saw the water. (Id., p. 13). She did not see any cart tracks or footprints in the puddle and did not know how long the water had been on the floor. (Id., p. 13-14)

At deposition, Susan testified that two female Caucasian employees "came to [her] right away" after the fall. (Doc. 50-2, p. 15). She did not recall their names (Id.)  She knew they were Walmart employees "[b]ecause they had their tags on." (Id., p. 16).  She did not know their respective positions at Walmart, but one lady had a radio. (Id., p. 21)

Susan also testified that one of these ladies said to her "I'm so sorry you got hurt. Those darn skylights leak every time it rains." (Doc. 50-2, p. 6-7) Susan described this lady as white, about five feet four inches tall, "heavyset", with short hair (Id., p. 16-17).  Susan could not remember the color of her hair or whether she wore glasses and could not guess her age (Id., p. 17-18).  Susan testified that the other lady was white, "about the same height" as the first lady, but "thinner" with short, "maybe blondish" hair.  (Id., p. 19-20).  Susan could not guess her age (Id., p. 20). Susan testified that the second lady was "the one that got the manager" and asked if "she needed to call an ambulance" (Id., p. 20)

In response to the motion for summary judgment, the Guys assert that the Walmart employee who made the statement, "I'm so sorry you got hurt.  Those darn skylights leak every time it rains" was a "uniformed Walmart employee (young African-American female)" identified as Destani Yates (Doc. 52, p. 1-2; Doc. 57).[7]  Yates signed an affidavit that she made this statement to Susan. (Doc. 57, p. 4-5). The Guys state that two weeks after Susan's deposition, her counsel sent an email to inform Walmart's counsel of Susan's mistaken testimony as to the

---

[7] In support, the Guys cite to Susan's deposition at pages 41-42, 53-54, and 59 (Doc. 52-1, Exhibit A to the Response).

race of one of the employees. (Id., p. 7). The Guys also state that their preservation of evidence letter, sent two weeks after the fall, "provides a clear description of the employees." (Id.) [8]

Citing the deposition testimony of Department Manager Ginger Donald, the Guys assert[9] that "Destiny" was the associate who informed Donald about Susan's fall. (Doc. 52, p. 3). She described "Destiny" as "a slender black young lady . . . in her twenties" (Doc. 52-4, p. 4).

Donald Yarborough, Jr. was the Saraland Walmart's assistant manager at the time Susan fell. (Doc. 50-3, Yarborough Deposition). He responded to the call on his radio. (Id., p. 4). Yarborough saw the water on the floor and deduced that it came from the skylight above where Susan fell (Id., p. 8-9). In accordance with Walmart's policy, Yarborough prepared a report, which stated that the water on the floor "was due to the skylight above that area that was leaking." (Doc. 50-4, Statement).

When RL Bishop employees arrived on July 16, 2016, they found the leaking skylight over the dairy section. (Doc. 50-6, p. 10). After reviewing photographs and work orders on the Saraland Walmart, Bishop testified that between 2013 and July 15, 2016, RL Bishop had not received any reports of roof or skylight leaks in the area where Susan fell. (Id., p. 17; p. 23). The RL Bishop employees also found damage to twenty-eight skylights, located in other areas of the

---

[8] The Guys point out that in July 2016, they wrote Walmart as follows: Also, there were two Walmart employees who spoke to Ms. Guy. One was a young African-American female. The other was a white lady, middle age, heavy set and about 5'6'. Demand is made that you maintain the records and notes as to their identity (the employee stated "I am so sorry you got hurt. This darn skylight leaks every time it rains.") (Doc. 57, p. 6, the Guys' chronology).

[9] The Guys also assert that "Destiny was the first person on the scene" (Doc. 52, p. 3). They appear to have misread or incorrectly cited Donald's deposition (Doc. 52-4, p. 2). Donald testified that she was in the cooler and "[m]y associate came back from the sales floor and told me that a lady had fell on the sales floor" (Id.)

store, but those skylights were not reported as leaking. (Id., p. 18). RL Bishop noted that the damage "appears to be from hail storm." (Doc. 52-9, p. 6). [10]

The relationship between Walmart and RL Bishop "goes back to the 90s[.]" (Doc. 52-5, p. 3). When asked whether "RL Bishop perform[ed] inspections of the roofs", Bishop, answered:

> I wouldn't say technically inspections just because, for example, with skylights, like in this situation. If you took the time to do a thorough inspection of each skylight, you would have to take the thing off the curb, … look at it in every detail and still may not observe any kind of defects that might be causing the leak.
>
> But as far as what we would do, would just, … do an overall look-over skylight. (*sic*) If we see something obvious, then, … obviously we would write it up in those situations.

(Doc. 52-5, p. 3).

Bishop testified that there were approximately 220 skylights on the Saraland Walmart. (Doc 52-5, p. 4). Prior to 2010, if RL Bishop received a work order, its employees would make a "visual inspection of the 200 plus skylights" as part of an "eight-point inspection." (Id., p. 3-4). During that time, RL Bishop "did more of an observation of the general condition of the roof whenever - - any time that [it was] dispatched and … on site to do any kind of service work." (Id.). RL Bishop employees "would have routinely … inspected or made a visual inspection" of all the skylights. (Id) Bishop confirmed the eight-point inspection began when the company "first started doing maintenance to Walmart, and that was something that [Walmart] kind of …

---

[10] In August 2016, five leaks were reported including two leaking skylights. At that time, the technician observed seven damaged skylights. (Doc. 52-9, p. 7). In April 2017, three roof leaks were reported. (Id.) In May 2017, a leaking pipe was reported (Id.). In October 2017, the gutters were cleaned and painted. (Id., p. 8). In January 2018, a roof leak was reported. (Id.) In May 2018, a roof leak was reported (Id.)

wanted us to do.  And we continued to do that up until probably somewhere around the late 2000's." (Id.)

Then, "somewhere around 2010", RL Bishop was "approached to discontinue spending the extra time to do more of those observations and stick mainly to the actual problem, do the specifically reported, whatever it may be." (Doc. 52-5, p. 4).  From that point, if there was a service call regarding the skylights, RL Bishop employees

> … would only really look at the skylights.  If there was something obviously wrong with multiple one. (*sic*) If there were say the one single one leaking and it wasn't any indications of any kind of storm damage, hail damage, something like that, probably wouldn't inspect any of the other skylights.
>
> If they happen to be walking by and see it, you know, on the way back to the ladder access or something like, they might would write it up too.  But for the most part, they wouldn't inspect any further unless there was an obvious sign that something major might have happened.

(Doc. 52-4, p. 4).

Bishop testified that even though the contract with Walmart did not require RL Bishop employees to "go and look for other skylight problems " while on the roof for a service call, the employees would still do so, and report the problems to Walmart, because this was "good" for business. (Doc. 50-6, p. 19)  Bishop testified that the employees were trained that in "certain situations" as "where it was obvious that some kind of problem came through and maybe hail damage, or something like that" they would "100 percent definitely go around and check each skylight and try to make sure that they don't see any more of this damage." (Id., p. 19-20).  He also agreed that "even if it's not hail damage, if they find a damaged skylight and as they're walking around they see other damage, they report that too." (Id., p. 19-20).

When RL Bishop completed the Claim Facts Form for the incident involving Susan, it described the roof conditions as follows:

Fair condition. In need of occasional maintenance. High foot traffic roof system subject to physical abuse including but not limited to punctures, scoring, cuts, etc. Also subject to cold welds (a.k.a open laps or open seams) due to improper installation of the roof membrane during original installation.

(Doc. 52-9, p. 1).

RL Bishop explained the work performed after Susan's fall as follows:

On July 15, 2016, after the loss occurred, RL Bishop & Assoc. Inc. technician found a broken skylight over the reported loss location in Dairy, believed to be the cause of the leak. The exact cause of skylight damage is unknown, although it appears to be subject to storm damage (along with 28 other skylights) caused by hail on an unknown date. RL Bishop & Assoc., Inc. is not responsible for damage caused to the skylights.

(Doc. 52-9, p. 2).

Walmart's corporate representative Ben Cole testified that Walmart does not have a rule or "routine time frame" for roof or skylight inspections. (Doc. 50-7, p. 11). Cole testified that a store can request an inspection. (Id., p. 2). Cole did not know about RL Bishop's eight-point inspections that stopped in 2011. (Id., p. 10).

Cole testified that Walmart has a reactive and proactive method for maintaining the skylights and roofs. (Doc. 50-7, p. 2-3). "Reactive maintenance" or reactive work orders mean that "a contractor is sent to work on . . . the roof" or something else, such as an air conditioner, when a problem is reported. (Id., p. 3, 8). Cole testified that "whenever any reactive maintenance is done on the roof, the contractor also inspects to see if they can find any other deficiencies on the roof, and then notify Walmart what they found." (Id., p. 3). Cole testified that Walmart is "under the assumption" that whenever RL Bishop employees are on the roof for a reactive work order, they are inspecting the entire roof. (Doc. 52-8, p. 33-34).

Walmart also has a "proactive roofing team that yearly looks at ages of roofs" and the "number of work orders and the dollar amount of those work orders to determine does the roof

need to be inspected." (Doc. 50-7, p. 2). If so, Walmart will "send out a third-party consultant to inspect the roof." (Id., p. 2-3). Cole testified that "there's enough reactive maintenance on the roof that there's inspections all the time, and all of those are a result of a work order. Then that's what feeds the proactive team, and that's one of the inputs to the proactive team to determine if [Walmart] needs to send out an inspector." (Id., p. 11).

The Saraland Walmart's original roof was recovered in 2007 with a "15-year" roof. (Doc. 50-7, p. 6, Doc. 50-8, p. 3). The last third-party inspection was performed in September 2012 by Advanced Roof Management. (Doc. 50-8). In conclusion, the inspector found as follows:

> The original roof system was recovered in 2007. This approximately 5-year old, Firestone mechanically fastened, TPO roof system is in good overall condition at this time with no sign of field membrane or seam failure. The majority of field membrane, flashings, and seams appear intact and watertight. The overall installation is of fair/good quality. The rooftop units and skylights are in good condition overall with safety grids installed at all skylights. The gutter/downspout assemblies are in good condition overall.

> According to assistant store manager Sean, no leaks have been reported or are active at this time.

> The remainder of the rooftop inspection found other minor deficiencies all of which are listed in the Roof Condition Checklist section of this report. Overall, the majority of the roof assembly was properly installed and is in good condition at this time. With the completion of the recommended repair listed above, this roof assembly should be able to remain in service for 9-10 years.

(Doc. 50-8, p. 3).

Cole testified that Walmart generally uses a Class One skylight that has a five-year warranty for manufacturer defects but no warranty for hail damage. (Doc. 52-8, p. 62). Cole testified that a different class of skylight is used in high velocity hurricane zones and that class also has an increased resistance to hail. (Id., p. 43-44). Cole did not know whether the specific

skylight at issue was the type for use in high velocity hurricane zones. (Id., p. 40). He testified that that decision "would be driven by" the building codes in the Mobile area. (Id., p. 40).

II.  Walmart's Motion to Strike.

Walmart moves to strike Susan's deposition testimony that a Walmart employee said "I am so sorry you were hurt. Those darn skylights leak every time it rains." (Doc. 56). Walmart argues that the statements are inadmissible hearsay because the Guys have not established that the employee was authorized to make a statement concerning the subject and have not established that the subject – roof and skylight leaks - was "a matter within the scope of the employee's employment." (Id., p. 4)

At deposition, Susan described the employee as a middle-aged white female, heavyset, with short hair, wearing a Walmart badge. In response to the motion to strike, the Guys argue that the employee was Destani Yates, a young African-American female and that Susan's deposition testimony was mistaken. (Doc. 57).[11]

The Guys point out that in July 2016, they wrote Walmart as follows:

> Also, there were two Walmart employees who spoke to Ms. Guy. One was a young African-American female. The other was a white lady, middle age, heavy set and about 5'6'. Demand is made that you maintain the records and notes as to their identity (the employee stated "I am so sorry you got hurt. This darn skylight leaks every time it rains.")

(Doc. 57, p. 6, the Guys' chronology).[12]

---

[11] The Guys state that two weeks after Susan's deposition, her counsel, by email, informed Walmart's counsel of the mistake as to the race of one of the employees. (Doc. 57, p. 3, n. 1). The Guys also state that their preservation of evidence letter that was sent two weeks after the fall, "provides a clear description of the employees." (Doc. 57, p. 7)

[12] The Guys provide a chronology of their efforts to obtain the identity of the female employee who made the statement, which includes an order for Walmart to produce a list of female employees working on the date of the slip and fall. (Doc. 57, p. 7-8). According to the Guys, Yates was listed as a "Food Sales Associate" not a "Dairy Associate". (Id., p. 8). Walmart states

The Guys now provide Yates' affidavit. (Doc. 57). She identifies herself as a "Dairy Associate" who was working in the Dairy Department of the Walmart in Saraland on July 15, 2016. Yates states that she saw Susan "lying on the floor in a puddle of what appeared to be water", that the "water was dripping from above her head from the skylight area", and that "I told her I was sorry she was hurt and I told her the skylights leaked when it rained." (Id., p. 4). Yates also states that part of her "duties and training as a Walmart employee (as with all employees) was look for anything that could create a slip hazard and do what I did when an injured customer is discovered. I knew of other leaks from skylights at the Saraland Walmart before Ms. Guy's slip and fall." (Id., p. 4-5).

The Guys argue that Yates' alleged statement is admissible as a vicarious admission pursuant to Federal Rule of Evidence 801(d)(2)(D). (Doc. 57). The Rule provides that a statement that "is offered against an opposing party and was made by the party's agent or employee on a matter within the scope of that relationship and while it existed" is not hearsay. The Guys also argue that the statement is admissible as an exception under Rule 803(1) as a present sense impression, or Rule 803(2) as an excited utterance, or Rule 807, the residual exception because coupled with the Affidavit, the statement has guarantees of trustworthiness. Last, the Guys argue that it is admissible not for the truth of the matter, but to show that Walmart had notice of a leaking skylight problem.

In reply, Walmart argues that the statement does not meet any hearsay exception because there is no evidence that Walmart authorized Yates to make the statement regarding the skylights or that the statement was a matter within the scope of Yates' employment. Walmart also argues

---

that Yates' identity was disclosed on June 6, 2019, the day that Walmart learned of her identity at Ginger Donald's deposition. (Doc. 58, p. 2, n.1).

that "exclusion of this evidence is inconsequential" because neither Yates' statement nor Susan's testimony establish that Walmart knew or should have known of the water on the floor beneath this specific skylight. (Doc. 58)

Rule 56(c)(2) states that a "party may object that the material cited to support … a fact cannot be presented in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2). A hearsay statement is generally not admissible. However, a "statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship [ ] is deemed an admission by a party opponent." Edwards v. Nat'l Vision Inc., 568 F. Appx. 854, 858 (11th Cir. 2014) (quoting Zaben v. Air Products & Chemicals, Inc., 129 F.3d 1453, 1456 (11th Cir.1997)). Pursuant to Rule 801(d)(2), vicarious admissions of a party opponent are admissible as an exception to hearsay when offered against the opposing party and made by the party's employee or agent on a matter within the scope of that relationship. Fed. R. Evid. 801(d)(2)(D).

"To satisfy Rule 801(d)(2)(D), two conditions must be met. First, an agency or employment relationship must have existed between the declarant and the party, during which time the statement must have been made. And second, the statement must have related to a matter within the scope of the agency or employment." 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 801.33 (2019); see also 2 McCormick On Evid. § 259 (7th ed.) ("The party offering evidence of the alleged agent's admission must first prove that the declarant is an agent of the adverse party and the scope of that agency.").

The parties do not dispute that Yates was a Walmart employee, who was working in the Dairy Department at the time of Susan's fall. The burden is on the Guys to lay a foundation to show that Yates' statement relates to a matter within the scope of her employment. Cf.

Wilkinson v. Carnival Cruise Lines, Inc., 920 F.2d 1560, 1566 (11th Cir. 1991) (ruling that a cabin steward's statement regarding a defective door was not within the scope of his employment and therefore, inadmissible under Fed. R. Evid. 801(d)(2)(D)). The Guys may establish by "independent evidence, either circumstantial or direct . . . that the scope of the declarant's agency included the subject matter of the statement." Jones v. Discount Auto Parts, LLC, 2017 WL 1396477, at *5 (M.D. Fla. Apr. 19, 2017) (citation omitted).

The Guys have presented sufficient evidence that Walmart associates are responsible for observing safety hazards in their areas. Yates stated: "Part of my duties and training as a Walmart employee (as with all employees) was look for anything that could create a slip hazard and do what I did when an injured customer is discovered." (Doc. 57, p. 4). Thus, Yates' alleged statement regarding the leaking skylights appears to have been a statement on a matter within the scope of her employment. The Guys also rely upon the history of "97 roof and skylight leaks documented by R.L. Bishop in the three years before the subject fall" as evidence that guarantees the trustworthiness of Yates' statement. (Doc. 57, p. 2).

Walmart argues that the Guys must establish that Yates was authorized "to make a statement concerning the subject[.]" (Doc. 56, p. 4; Doc. 58). However, the Eleventh Circuit has acknowledged that "Rule 801(d)(2)(D) broadened the traditional view so that it is no longer necessary to show that an employee or agent declarant possesses 'speaking authority[.]'" Wilkinson, 920 F.2d at 1565; see also United States v. Bonds, 608 F.3d 495, 520 (9th Cir. 2010) ("Under Rule 801(d)(2)(D), the proffering party must show the statement is *related to a matter* within the agent's scope of authority, not that making the statement is itself *within the scope* of authority.").

Additionally, Yates has now sworn that she made the statement to Susan (Doc. 57, p. 4-5).  See Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.")  In the same sworn statement, Yates established her status as an employee in the Dairy Department and her duty to look for anything that could create a hazard, including water on the floor from leaks in the roof or skylights.  Accordingly, Walmart's "Motion to Strike Portions of the Deposition Testimony of Plaintiff Susan Guy" (Doc. 56) is **DENIED.**

III. Walmart's Motion for Summary Judgment.

    A.  Standard of review.

Walmart removed this action on the basis of diversity jurisdiction. (Doc. 1, p. 2, ¶ 4) Therefore, the federal courts apply state substantive law and federal procedural law. Pussinen v. Target Corp., 731 Fed. Appx. 936, 938 (11th Cir. 2018).  Summary judgment is a procedural matter.  In that regard, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a). Walmart as the party seeking summary judgment, bears the initial responsibility of informing the district court of the basis for their motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

If that burden is met, the burden shifts to the Guys as the nonmovants, to "come forward with specific facts showing that there is a genuine issue for trial." Shaw v. City of Selma, 884 F.

3d 1093, 1098 (11th Cir. 2018) (citation omitted). "A fact is 'material' if it has the potential of 'affect[ing] the outcome of the case.'" Shaw, 884 F.3d at 1098. To create a genuine "dispute," the Guys must present enough evidence that "a reasonable jury could return a verdict" in their favor. Id.

Overall, the Court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." Jackson v. West, 787 F.3d 1345, 1352 (11th Cir. 2015) (citation and quotations omitted)). "Summary judgment is mandated under Rule 56, 'after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Williams v. Capital One Bank (USA) N.A., - - - Fed. Appx. - - -, 2019 WL 4187363, at *3 (11th Cir. Sept. 4, 2019) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter…the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998–99 (11th Cir. 1992) (internal citations and quotations omitted).

B. Analysis

1. Negligence

"In [a] premises-liability case, the elements of negligence 'are the same as those in any tort litigation: duty, breach of duty, cause in fact, proximate or legal cause, and damages.'" Ex parte Harold L. Martin Distrib. Co., Inc., 769 So. 2d 313, 314 (Ala. 2000) (citation omitted); Sessions v. Nonnenmann, 842 So. 2d 649, 651 (Ala. 2002) (same). The duty owed to the injured

person depends upon their status. There is no dispute of fact that Susan was Walmart's business invitee. Freeman v. Freeman, 67 So.3d 902, 907-908 (Ala. Civ. App. 2011) ("A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings of the possessor of the land.") (citation and internal quotation marks omitted).

As an invitee, Walmart owed a duty to Susan to "keep the premises in a reasonably safe condition and, if the premises are unsafe, to warn of hidden defects and dangers that are known to the landowner but that are hidden or unknown to the invitee." Galaxy Cable, Inc. v. Davis, 58 So. 3d 93, 98 (Ala. 2010); Patrick v. Publix Super Markets, Inc., 2017 WL 1159104, *3 (S.D. Ala. March 28, 2017) (same). Walmart is not "an insurer of the customers' safety but is liable for injury only in the event [it] negligently fails to use reasonable care in maintaining [its] premises in a reasonably safe condition." Dolgencorp, Inc. v. Hall, 890 So. 2d 98, 101 (Ala. 2003) (citing Ex parte Travis, 414 So. 2d 956 (Ala. 1982)). "There is no presumption of negligence which arises from the mere fact of an injury to an invitee." Burlington Coat Factory of Alabama, LLC v. Butler, 156 So. 3d 963, 969 (Ala. Civ. App. 2014) (citations omitted).

In order for Susan to recover, she must prove that her "fall resulted from a defect or instrumentality on the premises; that the defect was the result of the defendant's negligence; and that the defendant had or should have had notice of the defect before the time of the accident." Burlington Coat Factory of Alabama LLC v. Butler, 156 So. 3d 963, 969 (Ala. Civ. App. 2014) (citation omitted); Fowler v. CEC Entertainment, 921 So. 2d 428, 433 (Ala. Civ. App. 2005) (same). With respect to notice, the "basis of an invitor's liability rests upon his superior knowledge of the danger which causes the invitee's injuries." Edwards v. Intergraph Servs. Co., 4 So. 3d 495, 503 (Ala. Civ. App. 2008).

However, the Alabama Supreme Court "has held that an invitee need not present substantial evidence of the owner's actual or constructive notice of the defective condition when the defective condition is part of the premises, [ ] when the premises owner has affirmatively created the defective condition, [ ] or when the premises owner has failed to perform reasonable inspections and maintenance of the premises to discover and repair the defective condition[.]" Burlington Coat Factory of Alabama, LLC, 156 So. 3d at 969 (citing Mims v. Jack's Restaurant, 565 So.2d 609, 610 (Ala.1990), Wal–Mart Stores, Inc. v. McClinton, 631 So.2d 232, 234 (Ala.1993), and Norris v. Wal–Mart Stores, Inc., 628 So.2d 475, 478 (Ala.1993)).

The Guys have met their burden as to the first element. In order for Susan to recover, she must prove that her "fall resulted from a defect or instrumentality on the premises[.]" Burlington Coat Factory of Alabama LLC, 156 So. 3d at 969. The parties do not dispute that Susan fell when she slipped in a puddle of water from a leaking skylight.

As to the third element, the Guys must produce substantial evidence that Walmart "had or should have had notice of the defect before the time of the accident," Burlington Coat Factory of Alabama LLC, 156 So. 3d at 969, that would allow a reasonable jury to find that it had actual, constructive or presumed notice of the water before Susan fell. Walmart argues that the Guys cannot meet this burden because there is no evidence that the skylight had leaked in the past three years. Walmart also argues that assuming Yates stated that the skylights leaked when it rained, she did not state that this specific skylight had previously leaked. Walmart argues that Susan's testimony establishes that the puddle was clear, without footprints or tracking, such that the water was not on the floor for a sufficient period of time that Walmart should have been aware of its presence.

Walmart points out that none of the cases the Guys cite to argue that the defective condition was a part of the premises, or a fixture, involved a slip and fall caused by liquid on the floor. Walmart also points out that Susan did not come into direct contact with the alleged defective part of the premises, as is the usual circumstance. Walmart argues that typically in a defective premises case the alleged defective "fixture" or "part of the premises directly *caused* the invitee's injury" and this direct causation was the "court's sole basis for alleviating the notice requirement." (Doc. 55, p. 4) (italics in original). Walmart argues that Susan slipped and fell in water from the skylight, thus the hazard is the water not the leaking skylight. (Id., p. 5).

In response, the Guys argue that the defective condition is the skylight and not the water on the floor. They argue that two exceptions to the notice requirement apply. First, they argue that their claims "are in part based on 'defective conditions' in the subject Walmart, i.e., leaking skylight, hole in roof and open laps" and once proven, their "claims are due to be submitted to the jury." (Doc. 52, p. 14).[13] Alternatively, the Guys argue that they "are entitled to recover because Walmart failed to perform reasonable inspections and/or maintenance of its roof and skylights to discover or prevent the dangerous condition of water on the floor." (Id.).[14]

---

[13] As to notice, the Guys also argue that the "recurring incidents" of roof or skylight leaks create an "issue of fact as to Walmart's knowledge of the dangerous conditions posed by these premises defects." (Doc. 52, p. 19-20). They also argue that they were not "required to show that the skylights or roof above the subject slip and fall leaked on a prior occasion if there is evidence of other leaks in the premises." (Id., p. 22-23). They assert that Walmart's use of safety procedures does not insulate it from liability where the roof leaks unpredictably in different locations. Walmart responds that there is no evidence of a recurring condition of slippery floors during rainstorms at the Saraland store in the area where Susan fell and there is no evidence that the skylight previously leaked in that area.

[14] The Guys also argue that "Walmart's violation of its own policies and procedures in not having the roof and skylights regularly inspected is sufficient to allow Guy's claim to go the jury." (Doc. 52, p. 18-19). They cite to Wal-Mart Stores v. Tuck, 671 So. 2d 101 (Ala. Civ. App. 1995), wherein Walmart's assistant manager did not complete an incident report in the manner prescribed by Walmart's policy. They then argue that "[a]s in the Guy case, the evidence in Tuck showed that not noting the first employee on the scene, etc., contradicted Walmart

The Guys provide a summary of case law, [15] but their argument is found in a footnote. The Guys "point[] out that the cited cases in this brief dealing with defective premises do not require that the invitee be injured directly by contact with the defective item." (Doc. 52, p. 17, n.14). They argue that an "invitee must only show that the injury was 'caused by a defect or instrumentality . . . located on the premises[.]" (Id.). They assert that the "law involving defects is not hinged on whether or not the invitee came into physical contact with the defective item" but instead is "grounded in the law that parts of the store . . . 'require ordinary and reasonable maintenance in order to provide safe premises for the store customers" and that "[a]t the least, this is a jury issue." (Id.)

"[B]efore a defendant's notice can be presumed . . . a premises liability plaintiff must make a prima facie showing—via substantial evidence—that the offending condition is, in fact, defective." Johnson v. Sears Roebuck & Co., 2018 WL 2463119, at *3 (N.D. Ala. June 1, 2018). There is no dispute of fact that the skylight was leaking and that water from the skylight had pooled on the floor in the Dairy Department.

---

policy." (Id.) From this, they argue that "Walmart did not follow its own policies of having the roof and skylights thoroughly inspected every time R.L. Bishop conducted a reactive service call." (Id.). The Guys did not develop this argument. Instead, they raise it in two sentences. The Court will not speculate or make the Guys argument for them.

[15] Mims v. Jack's Restaurant, 565 So. 2d 609 (Ala. 1990) (Mims was injured when she tripped on a threshold and fell); Winn-Dixie Montgomery, Inc. v. Weeks, 504 So. 2d 1210 (Ala. 1987) (shopping cart tipped and child's face was impaled by wire extending from a candy rack); Isbell v. Aztecas Mexican Grill, 78 So. 3d 420 (Ala. Civ. App. 2011) (customer was injured when booth seat collapsed); Taylor v. Pezold Mgt. Assoc., Inc., 2015 WL 914906, at *4 (M.D. Ala. Mar. 3, 2015) (finding that the Play Place was a part of McDonald's premises and therefore, the question of whether defendant should have known of the protruding bolt, which allegedly caused the injury to the child, was a question for the jury); Bates v. United States, 2015 WL 4999740 (S.D. Ala. Aug. 21, 2015) (invitee injured when bench in courthouse collapsed); Norris v. Wal-Mart Stores, Inc., 628 So. 2d 475 (Ala. 1983) (customer injured when box of toothpaste fell on customer from a shelf that did not have railings); Smith v. Wells Fargo Bank, 233 So. 3d 991 (Ala. Civ. App. 2016) (bank customer injured when chair collapsed).

In <u>Mims v. Jack's Restaurant</u>, Mims was injured when she tripped on a threshold and fell.

The Supreme Court of Alabama gave the following distinction:

> The facts in this case should be distinguished from the facts in a case where a plaintiff slips and falls on a slick spot on a floor caused by food or another substance. In one of those slip and fall cases, a plaintiff not only must make a prima facie showing that her fall was caused by a defect or instrumentality (a substance causing a surface to be slick) located on the premises, but she must also present prima facie evidence that the defendant had or should have had notice of the defect or instrumentality at the time of the accident. <u>Massey v. Allied Products Co.</u>, 523 So.2d 397 (Ala.1988); <u>Tice v. Tice</u>, 361 So.2d 1051 (Ala.1978). On the other hand, in cases where the alleged defect is a part of the premises (in this case, a loose threshold in the main entrance of a restaurant), once a plaintiff has made a prima facie showing that a defect in a part of the premises has caused an injury, then the question whether the defendant had actual or constructive notice of the defect will go to the jury, regardless of whether the plaintiff makes a prima facie showing that the defendant had or should have had notice of the defect at the time of the accident.

<u>Mims</u>, 565 So. 2d at 610.

In <u>Gunter v. Publix Super Markets, Inc</u>., 2017 WL 2957942 (M.D. Ala. July 11, 2017), Plaintiff alleged that she slipped on water that leaked from a defective wax ring under a toilet. Plaintiff argued that the toilet was defective part of the premises.  Also, a witness testified that "she assumed the water came from the toilet, and specifically the broken seal, because she 'did not know anywhere else it would come from,'" but she also admitted that the water could have come from some unknown source."  Id., at *3.  The district court explained that "[u]nder the circumstances, and in light of the lack of any specific factual observation by Ms. Wright supporting her theory that the wax seal was broken, the absence of evidence of another source of water is not sufficient to establish that the water must have come from a broken wax seal under the toilet." Id.  The district court found that Gunter "failed to supply substantial evidence that the water on the floor was caused by a defective toilet" and that "the Magistrate Judge was correct to

conclude that Plaintiff had the burden of establishing that Defendant knew or should have known of the defective condition." Id.

Relevant to this action, the district court noted as follows:

For purposes of analysis, the court assumes, without deciding, that injury caused by falling in water from a broken toilet would be classified as an injury caused by a defect in the premises. In a negligence suit arising from injury that is not caused by a defect in the premises (such as injury from falling in rainwater, water from cleaning, or "substances of unknown origin"), a plaintiff is required to provide evidence that the defendant knew or should have known that the substance was present.

Gunter, 2017 WL 2957942, at *2, n.3 (citation omitted).

Another district court summarized the presumed-notice exception by observing:

Examples of defective conditions of which defendants' notice has been presumed include an unattached door threshold, Mims, 565 So. 2d at 611, merchandise protruding from a barbeque grill display, Wal-Mart Stores, Inc. v. Rolin, 813 So. 2d 861, 864 (Ala. 2001), a water-damaged seating booth, Isbell v. Aztecas Mexican Grill, 78 So. 3d 420, 425 (Ala. Civ. App. 2011), and a gun cabinet which protruded into an aisle, [Wal-Mart Stores, Inc. v.] McClinton, 631 So. 2d [232,] 234 (Ala. 1993). Alabama courts justify the presumption of notice in these circumstances because the dangerous conditions were fixtures requiring "ordinary and reasonable maintenance in order to provide a safe premises." Mims, 565 So. 2d at 611.

Johnson, 2018 WL 2463119, at *2.

The notice required, in order to hold a premise owner liable when the danger is caused by a foreign substance, was developed to lessen an owner's liability from "danger[s] resulting from a foreign substance on the floor placed there through the actions of a stranger, the presence of which would not reasonably be anticipated by the owner." De Soto Auto Hotel v. McDonough, 219 F.2d 253, 255 (6th Cir. 1955). This is because in such instances it is initially assumed that the owner does not have knowledge of the actions of a stranger that is superior to that of an invitee. See Edwards, 4 So. 3d 495 at 503 (The "basis of an invitor's liability rests upon his

superior knowledge of the danger….")  However, this logic does not hold when the owner had actual or constructive knowledge of a defective fixture on the premises which caused the foreign substance.

Although not exactly a fixture like those discussed in <u>Johnson</u>, there is no dispute of fact that the skylight is part of the premises, that it was defective, <u>i.e.</u>, leaking, and that the water pooled on the floor.  Walmart agrees that the water originated from a leaking skylight. (Doc. 50-1 at 8–9 (citing Doc. 50-3, p. 8–9, 11–12)); <u>see also</u> (Doc. 55, p. 1 n.1 ("The water on the floor undisputedly came from a single leaking skylight above the area of Plaintiff's fall . . . .")).  Although Susan did not come in direct contact with the skylight, her slip and fall was caused by the leaking skylight.

Because the danger was caused by a defective fixture, the Guys are not required to prove that Walmart's knowledge was superior to Susan's.  Instead, the Guys must show that the defective skylight which caused the danger was the result of the Defendant's negligence.   The Court finds there are issues of fact as to whether Walmart used reasonable care in maintaining its premises in a reasonably safe condition.  Accordingly, Walmart's motion for summary judgment on the negligence claim is DENIED.

2. <u>Wantonness</u>.

In Alabama, wantonness has been defined "as the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result." <u>Imperial Aluminum-Scottsboro LLC v. Taylor</u>, - - - So. 3d - - -, 2019 WL 4564908, at *11 (Ala. Sept. 20, 2019) (citations omitted); <u>Dolgencorp, Inc. v. Taylor</u>, 28 So. 2d 737 (Ala. 2009) (same); Ala. Code § 6-

11-20 (1975). Alabama statutory law defines wantonness as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others[.]" Ala. Code § 6-11-20(b)(3).

The Alabama Supreme Court has explained the difference between negligence and wantonness as follows:

> Implicit in wanton, willful, or reckless misconduct is an acting, with knowledge of danger, or with consciousness, that the doing or not doing of some act will likely result in injury....
>
> Negligence is usually characterized as an inattention, thoughtlessness, or heedlessness, a lack of due care; whereas wantonness is characterized as an act which cannot exist without a purpose or design, a conscious intentional act.

Taylor v. Pezoid Mgt. Assoc., Inc., 2015 WL 914906, *5 (M.D. Ala. Mar. 3, 2015) (citing Ex parte Anderson, 682 So. 2d 467, 470 (Ala. 1996)). Generally, "[w]antonness is a question of fact for the jury, unless there is a total lack of evidence from which the jury could reasonably infer wantonness[.]" Givens v. Saxon Mortgage Services, Inc., 2014 WL 2452891, *15–16 (S.D. Ala. Jun. 2, 2014).

The Guys argue that Walmart acted with reckless or conscious disregard of its customers' safety, with knowledge that harm would likely or probably result, specifically slip and fall injuries from leaks. As evidence of wantonness, the Guys point to the history of skylight and roof leaks; the lack of an annual or other inspection of the roof and skylights, in part as a money-saving measure; violations its own policy of proactively having the entire roof and skylights inspected each time work was performed in reaction to a leak; use of cheap "non-hurricane resistant" skylights to save money; and limiting the topics of discussion for the local Safety Team.[16]

_____

[16] The Guys rely upon the testimony of Crystal Malone, a Safety Team leader at the Saraland Walmart, to assert that the "Walmart home office never allowed or suggested that the local Safety Team (whose mission it was to prevent slips and falls and remedy conditions that create

The Guys argue that "Walmart chose to simply fix the leaks after they happened" and that this is a manifestation of Walmart's philosophy that if a part of the premises is not broken, there is no reason to repair it.

The Guys cite to the testimony of Walmart's 30(b)(6) designee, Ben Cole, as follows:

> Q. One of the factors I wanted to ask you about, what about age, simply the age of a skylight? Let's say it's not leaking, not cracking, it's not discolored, it doesn't have moisture, but it's a certain age.
>
> A. It's just like your old Ford pickup. It if keeps working.
>
> Q. Don't fix it if it isn't broken
>
> A. Right.

(Doc. 52-8, p. 49).

But Cole's statement does not evince a conscious culpability. See Greene v. Wal-Mart Stores E., L.P., 2016 WL 3519389, at *3 (N.D. Ala. June 28, 2016) (stating wantonness "requires more than a showing of some form of inadvertence on the part of the [defendant]; it requires a showing of some degree of conscious culpability.") (quoting Ex parte Anderson, 682 So.2d 467, 469 (Ala. 1996)). Choosing to wait until a leak actually occurs before repairing or replacing a roof or skylight, even with a history of leaks, does not show a conscious culpability or reckless or conscious disregard for the safety of others, and is not sufficient evidence of wanton conduct. Especially where, as here, there was no evidence that anyone had slipped and fallen in water from a roof or skylight leak before Susan's slip and fall.

---

risks of slips and falls) to even discuss why the 'improperly installed' Saraland store roof and failing skylights were leaking almost every time it rained." (Doc. 52, p. 25). In response to the question whether leaks over a period of time would have been discussed at a safety meeting, Malone responded "No" (Doc. 52-10, p. 9). Malone testified that the team had "certain topics for safety meetings" which she guessed were from the "home office." (Id.).

The Guys have not submitted any evidence from which a jury could reasonably infer that Walmart acted or failed to act with some degree of conscious culpability that injury would likely result. Accordingly, Walmart's motion for summary judgment with respect to the wantonness claim is GRANTED.

3. <u>Loss of Consortium</u>.

In Count 3, Jerry Guy claims damages for loss of consortium. To maintain a loss of consortium claim, "one of [Susan's] claims must survive summary judgment." <u>Powell v. Wal-Mart Stores, E., L.P.</u>, 2019 WL 1422721, at *6 (S.D. Ala. Feb. 12, 2019); <u>see also</u> <u>Ex parte N.P.</u>, 676 So. 2d 928, 930 (Ala. 1996) ("a claim for loss of consortium is a derivative claim, a jury must find for a spouse asserting a loss of consortium if the jury finds against the defendant on the underlying claim, provided that the spouse claiming loss of consortium can prove damage to his or her marital interest resulting from the underlying wrongful act").

Susan's claim of negligence has survived summary judgment. Therefore, summary judgment is denied as to Jerry's claim for loss of consortium.

IV.    <u>Conclusion</u>.

Upon consideration, and for the reasons set forth herein, Walmart's motion for summary judgment is GRANTED as to Count Two for wantonness. However, the Court finds that genuine issues of material fact exist regarding negligence as claimed in Count One. Therefore, summary judgment is DENIED as to Count One and Count Three, alleging loss of consortium.

**DONE** and **ORDERED** this the 6th day of November 2019.


 s/ Kristi K. DuBose
KRISTI K. DuBOSE
CHIEF UNITED STATES DISTRICT JUDGE